2000 OK CR 8

**Frank Duane WELCH, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–98–379.**

Court of Criminal Appeals of Oklahoma.

April 10, 2000.

Rehearing Granted May 17, 2000.

358

Albert J. Hoch, Oklahoma City, for Appellant at trial.

Scott L. Palk, Tracy Schumacher, Assistant District Attorneys, Norman, for the State at trial.

Janet Chesley, G. Lynn Burch, III, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Seth S. Branham, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## *O P I N I O N*

STRUBHAR, Presiding Judge:

¶ 1 Frank Duane Welch, hereinafter Appellant, was tried by jury and convicted of Murder in the first degree (21 O.S.Supp. 1982, § 701.7(A)), in the District Court of Cleveland County, Case No. CF–97–247, the Honorable Tom A. Lucas, District Judge, presiding. The jury recommended death after finding the murder was especially heinous, atrocious or cruel and that Appellant

constituted a continuing threat to society.[1] The trial court sentenced Appellant accordingly. From this Judgment and Sentence, he appeals.[2]

## FACTS

¶2 On February 25, 1987, Tracy Cooper arrived at his Norman home around 1:00 p.m. and found his wife, Jo Talley Cooper, lying dead in their living room. She was nude and had leather straps forming a ligature around her neck that also went down her back binding her hands. She had a piece of duct tape covering her mouth and one of her seven-month-old child's toys inserted in her vaginal area. The Coopers' seven-month-old child was unharmed and in his crib in his room.

¶3 The physical and circumstantial evidence at trial supported the State's theory that Appellant secured entry into the Coopers' home by posing as a Norman Cablevision employee[3] as there were no signs of forced entry and the Coopers' dogs were found secured in the garage, the location where Mrs. Cooper kept them when repairpersons were working who needed access to the backyard. After gaining secure entry, Appellant bound Mrs. Cooper with leather straps and tightened the straps around her neck causing her death by ligature strangulation. Appellant then raped Cooper, shoved a toy pylon into her vagina and left. The medical examiner testified Cooper's anal swab was positive for sperm and that she had perianal peri-postmortem tears which indicated the tears were sustained immediately after or during death. The medical examiner testified that Cooper had also sustained a peri-postmortem vaginal tear which was consistent with a trauma that could be caused by the insertion of a plastic toy like the one found in her vagina. The medical examiner also noted that Mrs. Cooper was approximately twelve weeks pregnant.

¶4 This case remained unsolved for approximately ten years until Appellant's name surfaced when his DNA was matched to a similar crime scene in the ten-year-old unsolved Debra Stevens homicide case in Grady County. Thereafter, Norman police detective, Steve Lucas, obtained a sample of Appellant's blood and had DNA testing performed. Appellant's DNA matched the DNA from sperm found on a towel at the Cooper home and charges were filed.

¶5 At trial Appellant admitted he killed both Mrs. Cooper and Debra Stevens. He claimed he met Mrs. Cooper during a service call at the Cooper residence when he was working for Norman Cablevision. He testified that they started having an affair shortly thereafter and that he had sex with her on three different occasions. He claimed on the day of her death he went to the Cooper home where Mrs. Cooper was expecting him. He testified she asked him to have anal sex with her and he complied. Following the anal sex, Appellant said he asked her if she would be willing to try sexual asphyxiation like he had read about in magazines. He professed she consented after which he placed the leather straps around her neck and hands. He then tightened the strap around her neck and began having vaginal sex with Cooper from behind. Appellant testified he did not stop immediately when Cooper collapsed because he did not realize she was in distress. When he rolled her over, she was not breathing and had no heartbeat. Because he was a convicted felon with pending charges, Appellant claimed he panicked and decided to make it look like Cooper was attacked. He described how he put more of the strap around her neck, how he duct taped her mouth because he did not like to see blood, how he wiped himself off with the kitchen towel, how he inserted the plastic toy in Cooper's vagina and how he left the Cooper home.

---

1. 21 O.S.1981, §§ 701.12(4) & (7).

2. Appellant's Petition in Error was filed in this Court on October 1, 1998. Appellant's brief was filed July 14, 1999, and the State's brief was filed October 11, 1999. A reply brief was filed on November 1, 1999. The case was submitted to the Court on October 15, 1999. Oral argument was held February 15, 2000.

3. Although Appellant had been fired from Norman Cablevision prior to February 25, 1987, he retained possession of his employee uniform. (Tr. 861, 870)

¶ 6 Appellant told the jury that he had plead guilty to his prior offenses because he was guilty, but would not plead guilty to the Cooper homicide because he did not intend to kill her. He further testified that he killed Debra Stevens with whom he was also having an affair. He maintained he intentionally killed Stevens following an argument where she threatened to tell authorities about the Cooper homicide if Appellant did not give her ten thousand dollars. Other facts will be discussed as they become relevant to the propositions of error raised for review.

## FIRST STAGE ISSUES

¶ 7 In his first proposition of error, Appellant argues he was denied a fair trial by the admission of evidence that he murdered Debra Stevens in Grady County three months after Talley Cooper's death. He claims the introduction of this other crimes evidence did not fall within the exceptions of 12 O.S.1991, § 2404(B) [4] forced him to defend against a collateral crime with which he was not charged, confused the issues and was nothing more than improper propensity evidence designed to prejudice him. Specifically, Appellant alleges evidence of the Stevens murder was improperly admitted because: (1) the State's *Burks* [5] notice was defective because the State failed to specify under which exception the evidence was sought to be admitted; (2) evidence of the Stevens murder was not necessary for the purposes cited by the State; (3) there was no visible connection between the Cooper and Stevens murders; (4) evidence of the Stevens murder was not necessary for the State to sustain its burden of proof; (5) the trial court's limiting instruction was defective because it failed to specify under which exception the evidence was being admitted; (6) the Stevens homicide was not part of the *res gestae*; and (7) evidence of the Stevens murder was more prejudicial than probative. The trial court consistently overruled Appellant's objections before the evidence was presented and throughout trial finding the evidence was relevant and that the probative value of the evidence outweighed its prejudicial effect. Appellant was granted a continuing objection to all evidence and testimony of the Stevens murder.

¶ 8 Evidence of other crimes or bad acts is not admissible as proof of bad character to show a person acted in conformity therewith but "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." 12 O.S.1991, § 2404(B). The reason other crimes evidence is so limited and its admission guarded revolves around fairness to the accused who should be convicted, if at all, by evidence of the charged offense and not by evidence of separate, albeit similar, offenses. *Bryan v. State*, 1997 OK CR 15, ¶ 33, 935 P.2d 338, 356, *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997). To be admissible, evidence of uncharged offenses must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. *Bryan*, 1997 OK CR 15, at ¶ 33, 935 P.2d at 356–57. When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed. *Id.*

---

4. 12 O.S.1991, § 2404(B) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

5. *Burks v. State*, 1979 OK CR 10, ¶ 11, 594 P.2d 771, 774–75, *overruled in part on other grounds by Jones v. State*, 1989 OK CR 7, 772 P.2d 922 (holding State must give defendant notice of other crimes evidence it intends to introduce along with the section 2404(B) purpose for which it will be used).

¶ 9 Appellant first attacks the *Burks* notice filed by the State because it failed to specify under which exception the evidence was sought to be admitted. Appellant also attacks the trial court's limiting instructions alleging the same defect. Because Appellant failed to object to the notice or the instructions, we will review for plain error. *Wood v. State*, 1998 OK CR 19, ¶ 35, 959 P.2d 1, 10. The record before this Court shows Appellant was adequately apprised that the State intended to introduce evidence of the Stevens murder. At trial defense counsel conceded he received proper notice under *Burks*, but argued the evidence was irrelevant and prejudicial. In light of the evidence presented against Appellant coupled with his own trial testimony, we find the failure to specify the section 2404(B) exception under which the evidence was sought to be admitted in the State's notice and in the trial court's instruction does not amount to plain error. However, we take this opportunity to remind trial judges and prosecutors of the importance of delineating the exception and purpose for which other crimes evidence is being offered. Specific rulings ensure fairness to the accused as well as facilitate expedient review of claims contesting admission of other crimes evidence.

¶ 10 The remainder of Appellant's complaints boil down to his assertion that the evidence of the Stevens murder did not fall within one of section 2404(B)'s exceptions and therefore the evidence was irrelevant, unnecessary and was more prejudicial than probative. Because Appellant lodged timely objections on this basis, the claim is properly preserved for review. When such a claim is properly preserved as in the instant case, the State must show on appeal that admission of the other crimes evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. *Bryan*, 1997 OK CR 15, at ¶ 33, 935 P.2d at 357.

¶ 11 In past cases, this Court has allowed evidence of other crimes or bad acts to be admitted under the "plan" exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. *Aylor v. State*, 1987 OK CR 190, ¶ 5, 742 P.2d 591, 593. In addressing the admissibility of such evidence, we have found it is relevant in determining the guilt or innocence of the accused when the peculiar method of operation is so unusual and distinctive as to be like a signature. *Eberhart v. State*, 1986 OK CR 160, ¶ 23, 727 P.2d 1374, 1379; *Johnson v. State*, 1985 OK CR 152, ¶ 4, 710 P.2d 119, 120; *Driver v. State*, 1981 OK CR 117, ¶ 5, 634 P.2d 760. Even though this Court has allowed such evidence under the "plan" exception, this exception is not the most accurate because it deals primarily with the admission of other crimes evidence to show the commission of one crime facilitated another. *See Jones v. State*, 1995 OK CR 34, ¶ 52, 899 P.2d 635, 649, *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996); *Luna v. State*, 1992 OK CR 26, ¶ 8, 829 P.2d 69, 72. However, in *Eberhart*, we recognized that distinctive methods of operation are relevant to prove the identity of the perpetrator of the crime. *Eberhart*, 1986 OK CR 160, at ¶ 23, 727 P.2d at 1379–80. Identity is the more appropriate label for such signature evidence because distinctive methods of operation are indicative of who perpetrated the crime.

¶ 12 In the instant case, one of the issues at trial was who killed Talley Cooper. In an effort to solidify its case against Appellant, the State introduced the Stevens homicide evidence with its similarities to prove to the jury that Appellant was in fact the person who also killed Cooper. Contrary to Appellant's assertion, the similarities between the two murders were sufficiently distinctive to create a visible connection between the crimes making the Stevens homicide evidence probative of a disputed fact in Appellant's trial. The similarities include: (1) no signs of forced entry; (2) each victim's house was adjacent to a large field; (3) the family dogs were locked inside rooms contrary to where the dogs were normally kept; (4) both murders occurred one day after Appellant appeared in Cleveland County District Court; (5) both victims were white females who were raped and strangled in their own homes during daytime hours; (6) drawers had been opened suggesting a robbery although nothing was missing; (7) both women were

gagged; (8) both victims were found nude, spread eagle, lying on their backs; and (9) both had ligatures around their necks which were similar with a loop forming a knot with the remaining cord/strap running through it.

¶ 13 Evidence of the Stevens murder also arguably fits within the absence of mistake or accident exception, notwithstanding Appellant's trial testimony.[6] During opening statement, defense counsel stated that the State would not be able to show Mrs. Cooper's death was intentional. He routinely questioned witnesses about the lack of forced entry and the lack of any evidence of a struggle, suggesting Mrs. Cooper was expecting Appellant and was a willing participant. Defense counsel also asked about the vaseline that was found at the scene and elicited that vaseline was sometimes used as a lubricant in consensual anal intercourse. Defense counsel elicited from the medical examiner that Mrs. Cooper's death could have been the result of autoerotic behavior. He also elicited from the DNA expert that DNA is the same whether it is the result of consensual or non-consensual conduct. This questioning was designed to suggest to the jury that Cooper's death could have equally been the result of an accident rather than an intentional murder as alleged by the State.

¶ 14 The more difficult questions to decide are whether the Stevens murder evidence was necessary to support the State's burden of proof and whether it was more probative than prejudicial. "In dealing with the relevancy of evidence, we begin with the presumption that in determining whether to admit such evidence, the trial judge should lean in favor of admission." *Mayes v. State*, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309–10, *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). The party opposing its introduction has the burden to show it is substantially more prejudicial than probative. *Mayes*, 1994 OK CR 44, at ¶ 77, 887 P.2d at 1310. When balancing the relevancy of evidence against its prejudicial effect, the trial court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *Id.*

¶ 15 In the instant case, the State bore the burden to prove Appellant intentionally killed Cooper. As discussed above, this case remained unsolved for ten years until Appellant's name surfaced when his DNA was matched to the Stevens homicide case. The State's DNA evidence placed Appellant at the Cooper residence and showed he had sex with Mrs. Cooper on the day of her death. It did not prove that he actually killed her. Evidence that Appellant killed Stevens in an almost identical manner to Cooper bolstered the State's case that Appellant killed Cooper. Further, evidence that Appellant killed Stevens showed Appellant intentionally killed Cooper and that her death was not an accident resulting from consensual autoerotic behavior. Despite its highly prejudicial nature, we find the probative value of the Stevens murder evidence outweighed its prejudicial effect and that the evidence was necessary to support the State's burden of proof. Finding the evidence properly admitted, this proposition is denied.

¶ 16 In his second proposition, Appellant alleges he was denied due process and a fair trial by the admission of irrelevant and speculative opinion evidence and evidentiary harpoons. In particular, Appellant complains about several opinions and statements made by Detective Steve Lucas and OSBI Agent Robert Lee.

¶ 17 Appellant first complains that Detective Lucas' opinion, that the Coopers' dogs were put in the garage as part of a ruse to enter the house, was impermissibly speculative and unduly prejudicial. At trial, Appellant objected to the initial question to elicit Lucas' opinion about the dogs on the ground of speculation. The trial court sustained the objection as to the "form of the answer" and stated that Lucas could give an opinion if he had one, but Lucas would not be allowed to state his suspicions or specula-

---

6. The Stevens murder evidence would have been relevant and unquestionably admissible in rebuttal if Appellant testified as he did at trial asserting Cooper's death was an accident. However, he maintains he was compelled to testify after the trial court ruled the Stevens evidence admissible in the State's case in chief.

tions. The prosecutor then asked Lucas if he had an opinion based on his analysis of the crime scene concerning the location of the dogs given the lack of forced entry. Lucas opined the dogs were in the garage as part of a ruse to enter the house. Because Appellant did not object to this response, he has waived all but plain error. *Washington v. State,* 1999 OK CR·22, ¶ 18, 989 P.2d 960, 969.

¶ 18 We find, based on our review of the record, that Detective Lucas' challenged testimony constituted a proper lay opinion based on his investigation. 12 O.S.1991, § 2701. Lucas testified that he took over the Cooper homicide investigation in November 1989, some two and half years after the crime. In order to familiarize himself with the case, he read all the police reports along with the witnesses' statements as well as reviewed the physical evidence. He then re-interviewed family members and friends in an effort to generate relevant leads. Family members testified that the dogs were usually in the backyard unless a repairperson was there and needed access to the backyard. Appellant's ex-wife testified that Appellant still had his Norman Cablevision uniforms when Cooper was killed. Lucas' opinion was rationally based on his perceptions following his investigation which aided the jury in its determination of a fact in issue. Accordingly, the opinion was proper and did not amount to error, much less plain error.

¶ 19 Second, Appellant complains about Detective Lucas' statement that both the Cooper and Stevens homicides occurred the day after Appellant appeared in court. As the State points out, the statement constitutes factual testimony rather than opinion. Further, there is nothing speculative about it. It is simply a factual statement properly admitted to show another similarity between the two crimes in an effort to establish Appellant as the perpetrator of the Cooper homicide. 12 O.S.1991, § 2404(B). Such evidence was more probative than prejudicial. 12 O.S.1991, § 2403.

¶ 20 Next, Appellant complains that Detective Lucas injected irrelevant and speculative evidence into the trial when he described the manner in which Talley Cooper's hands were bound. Lucas described the bindings as "it's got a large slipknot almost on one hand that's pulled tight and then wrapped in, oh, half-inch cattle—like calf roping-type thing." Appellant claims Lucas used the calf roping description in an effort to unfairly incriminate him after he told Lucas during an interview that he had been involved in rodeos and owned livestock. Appellant also attacks Lucas' testimony that the leather straps used to bind Talley Cooper were scrap leather known as "farmer's bundles" which Lucas said were sold at saddle and boot shops. He maintains this testimony allowed Lucas "to improperly imply that [Appellant], as a rodeo veteran, had tied up Talley Cooper like livestock." *See Appellant's Brief* at 38. Contrary to Appellant's claim, this testimony was neither speculative nor irrelevant opinion evidence. Lucas merely described his personal observations of how the victim's hands were tied using the calf-roping reference to explain what he saw. Moreover Lucas described his investigation that uncovered the fact that the straps were scrap leather known as "farmer's bundles." Accordingly, we find the admission of this testimony was not error.

¶ 21 Fourth, Appellant maintains Lucas improperly invaded the province of the jury when he testified Cooper's death was not self-inflicted or the result of autoerotic behavior, that her death was not accidental but intentionally inflicted and that Cooper's wounds were not consistent with sexual asphyxiation. In *Romano v. State,* 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996), we addressed the propriety of opinion evidence on ultimate issues and stated:

Opinion evidence on ultimate issues is generally admissible. 12 O.S.1991, § 2704. However, the "otherwise admissible" language of § 2704 must be read in context with 12 O.S.1991, §§ 2403, 2701, 2702. While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible. (citations and footnotes omitted)

*See also Cannon v. State,* 1998 OK CR 28, ¶ 18, 961 P.2d 838, 846.

¶ 22 In the instant case, the prosecutor did not formally qualify Detective Lucas as an expert by asking the trial court to recognize him as such. However, the prosecutor qualified Lucas to render certain opinions after asking him about his sixteen year career as a police officer and his specialized training in sexual asphyxiation deaths. Thereafter during questioning, the prosecutor asked Lucas if he attached any significance to his analysis of Mrs. Cooper's injuries given his training. Lucas testified Cooper's injuries were intentionally inflicted and were not accidental, self-inflicted or the result of autoerotic behavior. The trial court sustained defense counsel's objection to Lucas' opinion after the prosecutor offered to rephrase the question. Lucas then explained that in sexual asphyxiation cases, the participants pad the noose device so no marks are left on the neck. Further, the participants employ an escape mechanism in case of distress so they will not die. Lucas testified these common attributes he learned of in training were not present in the instant case.

¶ 23 A review of the record shows Lucas' opinion was not improper opinion testimony on an ultimate issue since it did not tell the jury what result to reach. Lucas' testimony was based upon his examination and investigation of the crime scene coupled with his training. In his testimony Lucas described his in depth investigation and review of police reports, witnesses' statements and numerous photographs of the crime scene. Lucas then told the prosecutor that the physical evidence was not consistent with consensual behavior. At no time did Lucas say that Appellant intentionally killed Cooper; rather, he testified Cooper's bindings that resulted in her death were not consistent with consensual autoerotic behavior based on his specialized knowledge in homicide investigation. As this was proper opinion testimony, no error occurred in its admission.

¶ 24 In Appellant's final complaint about Detective Lucas, he claims Lucas intentionally injected an evidentiary harpoon when he testified that Appellant told him he had participated in rodeos not only during childhood, but while in prison. As the trial court found, Appellant was not prejudiced by this reference to other crimes/prison. As part of his defense against imposition of the death penalty, defense counsel advised the jury in opening statement that Appellant was serving a life sentence plus consecutive forty-five and twenty year sentences in an effort to show the jury Appellant was not a continuing threat because he would never be in society again. To bolster his credibility, Appellant detailed his many prior convictions during his testimony maintaining he accepted responsibility when he was in fact guilty. Given this evidence, we find that Lucas' reference to prison had no impact on the verdict or sentence.

¶ 25 Lastly, Appellant claims he was prejudiced by an evidentiary harpoon willfully launched by OSBI Agent Robert Lee. Agent Lee testified that Appellant was investigated in connection with the Stevens homicide because they received information that Appellant had left the Grady County area abruptly after the crime, that Appellant and his former wife were friends with the Stevens and lived in property adjoining or close to them and that Appellant had raped his former wife prior to their marriage and liked to tie her up during sex. The trial court overruled Appellant's objection and denied his motion for mistrial to the latter portion of Lee's answer finding such evidence was not prejudicial in light of the properly admitted other crimes evidence. However, the trial court did offer to admonish the jury since the evidence was irrelevant. Initially, defense counsel refused any admonition claiming it would only serve to emphasize the improper evidence and could not cure the error. Following a lunch break and additional discussion, defense counsel acceded to having the jury admonished. Thereafter, the trial court advised the jury there was no evidence to support Lee's statement that Appellant had raped his former wife and that such statement should be disregarded and not considered.

¶ 26 This Court has consistently held that when inadmissible evidence or an im-

proper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error. *Patton v. State,* 1998 OK CR 66, ¶ 68, 973 P.2d 270, 292, *cert. denied,* — U.S. —, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). *See also Al–Mosawi v. State,* 1996 OK CR 59, ¶ 59, 929 P.2d 270, 284, *cert. denied,* 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997) (a trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures any error unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict). Here, the admonishment given to the jury was sufficient to cure any error, even though the admonition failed to specifically address Lee's statement that Appellant liked to tie up his former wife during sex. A review of the record shows that such remark was not verdict or sentence determinative given the strong evidence against Appellant. Accordingly, this proposition of error is denied.

¶ 27 In his third proposition of error, Appellant claims he was denied a fair trial and his right to confront witnesses against him by the admission of prejudicial hearsay evidence whose probative value was questionable and whose reliability was suspect. In rebuttal, Katherine Roberts testified she received a telephone call from her friend, Talley Cooper, several weeks before her death. Cooper told Roberts that a man had come to her house to look at her cable who followed her very closely and seemed more interested in following and talking to her than in looking at the cable. Cooper told Roberts that he scared her and gave her the "creeps." Cooper described the man as greasy-looking and dirty.

¶ 28 The trial court correctly allowed Cooper's statement that the cableman scared her and gave her the "creeps" under the state of mind exception to the hearsay rule. 12 O.S.1991, § 2803(3). Such antecedent declarations by a decedent are admissible in a homicide case to show the decedent's state of mind toward the defendant or to supply the motive for killing. *Moore v. State,* 1988 OK CR 176, ¶ 18, 761 P.2d 866, 870. Here, although Cooper did not identify Appellant as the cableman, Appellant testified he met Cooper several weeks before her death when he responded to a service call thereby supplying that fact. The testimony concerning Cooper's apprehension of Appellant provided an insight into her state of mind especially in light of Appellant's claim that after his initial service call he and Cooper started a consensual extramarital affair and that her death was an accident. *See Moss v. State,* 1994 OK CR 80, ¶ 40, 888 P.2d 509, 519; *Hooker v. State,* 1994 OK CR 75, ¶ 27, 887 P.2d 1351, 1360, *cert. denied,* 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995).

¶ 29 However, the remainder of the statement that Appellant came to her home to look at the cable, followed her around and seemed more interested in her than in looking at the cable does not go to Cooper's state of mind. The State concedes this part of the statement touches on Appellant's past acts which is generally inadmissible, but argues such testimony was necessary to establish the reliability of Cooper's statement to Roberts and to establish that Appellant was the cableman to which Cooper referred. These references to Appellant's past acts were not necessary to establish reliability or identity in light of Appellant's testimony. Therefore, that part of the statement should have been excluded. However, because we find beyond a reasonable doubt that this error did not contribute to the verdict or sentence, this error is harmless and relief is not warranted. *Hooker,* 1994 OK CR 75, at ¶ 28, 887 P.2d at 1360.

¶ 30 In his fourth proposition, Appellant contends the trial court erred in admitting certain photographs of Appellant's victims, a joint autopsy diagram of Cooper and Stevens, a diagram of the Cooper residence and the DNA statistical evidence. We note the admission of evidence is left to the sound discretion of the trial court whose decision will not be disturbed absent a showing of abuse thereof. *Miller v. State,* 1998 OK CR 59, ¶ 49, 977 P.2d 1099, 1110, *cert. denied,* — U.S. —, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999). Because Appellant did not object to each of the above pieces of evidence, we will address the admission of

the evidence that was properly preserved by timely objection and the remaining will be reviewed for plain error. *Miller*, 1998 OK CR 59, at ¶ 48, 977 P.2d at 1110

¶ 31 First, Appellant contends that certain photographs of his victims introduced into evidence were unduly prejudicial and should have been excluded from evidence.[7] Photographs are admissible so long as their probative value outweighs their prejudicial effect. Photographs are not excludable merely because they may be considered inflammatory or gruesome. *See Jackson v. State*, 1998 OK CR 39, ¶ 96, 964 P.2d 875, 897, *cert. denied*, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999). In *Jackson*, this Court held that photographs are admissible where they show the injuries suffered by the victim, show the location of the crime scene, and corroborate the testimony of the medical examiner. See id. Such is the situation in the present case. Exhibits 12–14 plainly show the location of Cooper's body at the crime scene as well as some of the injuries she sustained. The photographs are from different angles and are not unnecessarily cumulative. Further, they are not unduly prejudicial because they show a baby blanket and toys. The evidence showed Cooper had a young child who was found in his crib when Tracy Cooper came home and found his wife. The photographs simply show the crime scene at the Cooper home as it was found and no error occurred in their admission.

¶ 32 Exhibits 26 and 28–30 show the location of Debra Stevens' body and some of the injuries she sustained. As stated above in proposition one, the issues at trial were who killed Talley Cooper and was it intentional. To prove its case against Appellant, the State introduced the Stevens homicide evidence including the photographs to show the similarities between the two crimes to prove to the jury that Appellant was the person who intentionally killed Cooper. The similarities between the crimes, as evidenced in the photographs, were sufficiently distinctive to create a visible connection between the crimes making the Stevens homicide evidence probative of a disputed issue in Appellant's trial. As such, the photographs were properly admitted.

¶ 33 In rebuttal, the State called Paige Hora to rebut Appellant's account of his encounter with her. During his testimony, Appellant downplayed his assault of Hora in which he cut her with a knife and for which he received a life sentence. To adequately illustrate the injuries Appellant inflicted on Hora, the State introduced Exhibits 45–47 which showed Hora's injuries some two or three days after the incident. Because Appellant failed to object and the photographs were more probative than prejudicial, we find the trial court did not abuse its discretion in admitting these photographs and no plain error occurred. Accordingly, no relief is warranted.

¶ 34 Second, Appellant complains about the admission of a joint autopsy diagram of Cooper and Stevens (Exhibit 37A) and the diagram of the Cooper residence (Exhibit 25). Appellant maintains the joint autopsy diagram was misleading and prejudicial. Since both Cooper and Stevens died from ligature strangulation and were found with a ligature around their neck and wrists, Appellant contends the use of the same diagram with markings showing injuries common to that type of death caused these two separate cases to appear more alike than they actually were. As stated above, the similarities between the two crimes were distinctive enough to warrant admission of evidence about the Stevens homicide to prove the State's case. The use of the dual diagram was relevant to show the similarities of the women's injuries and we find its probative value was not outweighed by the danger of unfair prejudice. The admission of the diagram of the Cooper residence was also proper. Although Appellant claims the diagram included notations of the location of the baby blanket and toys and baby's bedroom to inflame the jury, this diagram accurately reflected the residence and testimony of wit-

7. Appellant specifically complains of State Exhibits 12–14, 26, 28–30 and 45–47. Exhibits 12–14 show Cooper's body as she was found in her living room. Exhibits 26 and 28–30 depict Debra Stevens as she was found in her home and Exhibits 45–47 show the injuries Appellant inflicted on Paige Hora.

nesses. Because the trial court did not abuse its discretion in admitting any of these exhibits, no relief is required.

■ ¶ 35 Lastly, Appellant complains about the admission of the DNA statistical evidence. Appellant recognizes that this Court has previously approved of the use of such evidence, but nevertheless asks this Court to reconsider its prior decisions and find that such statistical evidence improperly inflates the strength of the DNA evidence and gives the evidence authority it does not deserve. We reaffirm our prior holdings and find the DNA statistical evidence was properly admitted in this trial. *See Wood,* 1998 OK CR 19, at ¶ 41, 959 P.2d at 11–12; *Taylor v. State,* 1995 OK CR 10, ¶ 34, 889 P.2d 319, 334–38. This proposition is, therefore, denied.

■ ¶ 36 In his fifth proposition of error, Appellant claims the trial judge erred in failing to recuse *sua sponte* from the instant case because the judge's son was the primary case agent and a key prosecution witness. Appellant maintains that by presiding over a case in which his son was a crucial, material witness for the State, the trial judge was unavoidably biased thereby creating a structural defect not subject to waiver or harmless error analysis. To support his claim the trial judge was biased, Appellant avers he was prejudiced by the evidentiary rulings during Detective Lucas' testimony as argued in his second proposition of error.[8]

■ ¶ 37 "The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court." *Fitzgerald v. State,* 1998 OK CR 68, ¶ 10, 972 P.2d 1157, 1163. The decision of a trial judge to disqualify herself from hearing a criminal case is within the sound discretion of that judge whose decision will not be disturbed on appeal unless abuse of that discretion is shown. *Id.* A defendant asserting a claim that the trial judge was biased and abused her discretion must show the trial court harbored prejudice against him which materially

affected his rights at trial and that he was prejudiced by the trial court's actions. *Id.* However, "the right to preclude a disqualified judge from trial is a personal privilege which can be waived" by the failure to strictly comply with the proper procedure for seeking the disqualification of the trial judge. *See Hatch v. State,* 1983 OK CR 47, ¶ 5, 662 P.2d 1377, 1380, *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986); *Willis v. State,* 1982 OK CR 134, ¶ 4, 650 P.2d 873, 874.

¶ 38 During a pre-trial hearing, the trial judge advised the parties that his son was one of the detectives in this case. Both defense counsel and Appellant stated on the record they did not have any objection to the trial judge presiding over the trial. Following the pre-trial hearing, neither defense counsel nor Appellant sought to have the trial judge disqualified pursuant to 20 O.S. 1991, § 1403.

■ ¶ 39 This case is similar to *Smith v. State,* 1987 OK CR 94, ¶ 5, 737 P.2d 1206, 1209, *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987), also a capital case, in which the appellant alleged prejudice on appeal because the preliminary hearing magistrate was the brother of the prosecuting attorney. The *Smith* court found the appellant and his defense counsel expressly waived any conflict in open court and the appellant did not show why the waiver would be invalid. *Smith,* 1987 OK CR 94, at ¶ 6, 737 P.2d at 1209. An examination of the record herein reveals Appellant and defense counsel affirmatively waived any conflict by so stating on the record and by failing to follow the mandated procedures for seeking a trial judge's disqualification. *Hatch,* 1983 OK CR 47, at ¶ 5, 662 P.2d at 1380; *Willis,* 1982 OK CR 134, at ¶ 4, 650 P.2d at 874. Even if we were to indulge Appellant and find he did not waive his right, he could not prevail because he cannot show the trial court harbored prejudice against him. *See*

---

8. The record shows that the jurors were not apprised of the relationship between the trial judge and the witness.

Proposition II, supra. Accordingly, this proposition is denied.[9]

## SECOND STAGE ISSUES

¶ 40 In his sixth proposition of error, Appellant claims he was denied a fair sentencing proceeding by the admission of improper, prejudicial and irrelevant victim impact evidence. Appellant begins by arguing the victim impact testimony was inadmissible because it fell outside the scope of 22 O.S.Supp.1993, § 984. Victim impact evidence is limited to evidence of the murder's impact on the victim's family. *Miller*, 1998 OK CR 59, at ¶ 70, 977 P.2d at 1113. It is introduced to tell the jury about the "financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family." 22 O.S.Supp.1993, § 984. Victim impact testimony may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence. *Id.*

¶ 41 In the present case, the victim impact evidence was offered through five family members. Appellant challenges several portions of each family member's testimony. The majority of the testimony about which Appellant complains was not preserved by timely objection and review is limited to plain error. While arguably some of the victim impact testimony focused on the emotional impact of the homicide on the family, the victim impact testimony also focused on the psychological impact of Cooper's death on her family and gave the jury a brief glimpse of her life. When the victim impact testimony is read in its entirety and in context, it is clear no plain error occurred.

¶ 42 At trial, Appellant specifically objected to Cooper's sister testifying about Cooper's son putting flowers on his mother's grave and brushing the dirt away after his grandfather's funeral. Such testimony does not fall within the statutory guidelines and it was error to admit such testimony as it had little probative value of the impact of Cooper's death on her family and was more prejudicial than probative. However, this error did not contribute to the sentence rendered given the strength of the State's case in aggravation and the trial court's proper instruction on the use of victim impact evidence. *See Cannon*, 1998 OK CR 28, at ¶ 49, 961 P.2d at 851.

¶ 43 Appellant also objected to Cooper's mother's testimony that her husband died without knowing who committed the crime, that she wanted closure and justice, that she had survived her daughter's death only through the love and support of her God, family and friends, and that there were so many things she wanted to say, but could not. This testimony demonstrated how the victim's death emotionally, psychologically and physically affected the victim's mother. Because the crime remained unsolved for ten years, such a delay had an emotional and psychological effect on the family as evidenced by her testimony. She testified how Cooper's death affected her husband, who was so upset by his daughter's death he would sit and cry asking who had done this to his daughter. She then explained how difficult it was that he did not live to see the perpetrator charged.

¶ 44 Not surprisingly after a ten year wait, Cooper's mother testified how she wanted closure and justice after such a long ordeal and how she had survived with love and support from her family and friends. In closing, she told the jury there was so much she would like to tell them about how hard Cooper's death had been on her family and especially Cooper's son, but she could not. The record does not support Appellant's contention that this was some sinister insinuation that she was precluded from telling the jury things they needed to know. Rather, the record suggests she found it too difficult to talk about these things. Because this evidence was proper victim impact evidence and was more probative than prejudicial, no error occurred in its admission.

9. Because the scrutiny is higher in death penalty cases as a death sentence is qualitatively different from other punishments, we recommend trial judges recuse when a familial relationship exists between the judge and a witness so as to avoid any appearance of partiality.

¶ 45 Lastly, Appellant objected to Cooper's husband's reference to her pregnancy. As the medical examiner had testified in first stage that Mrs. Cooper was pregnant at the time of her death, Appellant was not prejudiced by the isolated reference to her pregnancy in the victim impact statement of Cooper's husband.

¶ 46 Appellant also claims there is no provision allowing for an opinion of a recommended sentence in capital cases in Oklahoma and asks this Court to reconsider its prior decisions upholding sentence recommendations. Section 984 authorizes "the victim's opinion of a recommended sentence." Based on this language, we continue to find that sentencing recommendations by victims or their survivors are relevant and admissible as long as the recommendation is given as a straight-forward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification. *Wood*, 1998 OK CR 19, at ¶ 46, 959 P.2d at 12. Because each of the sentence recommendations in this case fit within the above parameters, no error occurred.

¶ 47 Finally, Appellant claims that victim impact evidence operates as a "super-aggravator" and is irrelevant in Oklahoma's capital punishment balancing scheme. This Court has consistently held that victim impact evidence does not act as a superaggravator and is a relevant consideration under Oklahoma's capital sentencing scheme. *E.g. Douglas v. State*, 1997 OK CR 79 ¶ 82, 951 P.2d 651, 675, *cert. denied*, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998). Inasmuch as we feel this issue is settled at this time, we see no need to revisit it further. Therefore, this proposition is denied.

¶ 48 In his seventh and eighth propositions of error, Appellant asks this Court to reconsider its prior decisions upholding the constitutionality of the aggravating circumstances found by the jury—the defendant constitutes a continuing threat to society and the murder was especially heinous, atrocious or cruel. Appellant maintains these aggravating circumstances are unconstitutionally vague and fail to perform the narrowing function that is constitutionally required. We have consistently held, and continue to find, that both circumstances are constitutional and that the uniform jury instructions properly define and channel the jury's decision making process. *See Miller*, 1998 OK CR 59, at ¶ 62, 977 P.2d at 1112; *Malone v. State*, 1994 OK CR 43, ¶ 28, 876 P.2d 707, 716 (upholding the continuing threat aggravating circumstance); *Cannon v. State*, 1998 OK CR 28, at ¶ 72, 961 P.2d at 855; *Le v. State*, 1997 OK CR 55, ¶ 41, 947 P.2d 535, 552, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998)(upholding the especially heinous, atrocious and cruel aggravating circumstance). Because we reaffirm our prior holdings, we find these propositions should be denied and no relief is warranted.

¶ 49 In his ninth proposition of error, Appellant argues the instructions on the issue of mitigation failed to require the jury to consider the mitigating evidence after the jury determined that such evidence existed. He maintains that mitigation evidence is diminished when the trial court instructs the jury it "must" consider aggravating evidence while permissively instructing the jury that it "may" consider mitigating evidence. We have consistently rejected Appellant's argument that instructing the jury that they "may consider" mitigating evidence creates a doubt as to the jury's constitutional duty to consider such evidence. *Miller*, 1998 OK CR 59, at ¶ 71, 977 P.2d at 1113; *Turrentine v. State*, 1998 OK CR 33, ¶ 104, 965 P.2d 955, 982, *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998). We again reaffirm our prior holdings and reject this claim. After reviewing the instructions given to the jury in this case concerning mitigating evidence, we find no error. Accordingly, this proposition of error is denied.

¶ 50 In his tenth proposition of error, Appellant alleges he was denied competent trial counsel in violation of the Sixth Amendment. Appellant argues trial counsel was deficient because he failed to challenge the admissibility of Appellant's prior Tulsa County convictions before eliciting the prior convictions during Appellant's direct examination, failed to limit Appellant's testimony regarding his Tulsa County convictions, failed to object to

the admission of the rebuttal testimony of Katherine Roberts, failed to list adaptability to prison life as a mitigating circumstance, failed to request recusal of the trial judge and failed to advise Appellant about his decision to testify. Appellant also claims counsel failed to adequately prepare, investigate and use available mitigating evidence and to use available evidence to impeach Katherine Roberts.

¶ 51 "To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance." *Humphreys v. State*, 1997 OK CR 59, ¶ 40, 947 P.2d 565, 577–78, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). *See also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To show prejudice, an appellant may no longer prevail by merely showing the outcome of his trial would have been different but for counsel's errors. *Malone*, 1994 OK CR 43, at ¶ 12, 876 P.2d at 712. Instead, an appellant must show the ineffectiveness of counsel deprived him of a substantial or procedural right to which the law entitled him. *Id.* Furthermore, this Court will readily dispose of ineffective assistance of counsel claims when no prejudice can be shown. *Welch v. State*, 1998 OK CR 54, ¶ 82, 968 P.2d 1231, 1252, *cert. denied*, —— U.S. ——, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).

¶ 52 First, Appellant attacks counsel's decision to elicit his prior Tulsa County convictions that did not involve dishonesty along with some of the circumstances of that case without obtaining a ruling that these prior felony convictions, for purposes of impeachment, were more probative than prejudicial. The record shows this was part of the defense's strategy. Appellant's defense to the instant case was he never intended to kill Cooper and her death was an accident that resulted from a consensual sexual encounter. To boost his credibility, defense counsel elicited Appellant's prior convictions and some of the facts about the Tulsa County crimes in

an effort to show Appellant was willing to admit and take responsibility for his prior misconduct. Defense counsel elicited facts about the Tulsa County crimes in lieu of merely listing them to show that Appellant attacked Paige Hora because he thought she was trying to interfere with a drug deal in which he was acting as lookout. Counsel employed this strategy to avoid leaving the jury with the impression that Appellant was a man who liked to terrorize and kill women.

¶ 53 To further boost Appellant's credibility and his overall defense, defense counsel elicited from Appellant that he had plead guilty to all his prior crimes, including the Tulsa County crimes, accepting responsibility for his wrongful acts. This strategy bolstered Appellant's claim that he went to trial in the instant case because he believed he was not guilty. Defense counsel further elicited Appellant's Tulsa County convictions, for which Appellant was serving a life plus consecutive forty-five year sentence, to argue Appellant did not constitute a continuing threat because he would be incarcerated for the rest of his natural life. Inasmuch as Appellant cannot overcome the presumption that the challenged action was sound trial strategy under the circumstances, this claim must fail.

¶ 54 Appellant also attacks counsel's failure to object to the admission of Katherine Roberts' rebuttal testimony, his failure to impeach Roberts' testimony and his failure to request recusal of the trial judge. Counsel did lodge a hearsay objection to Roberts' testimony concerning her telephone call with Cooper which was overruled. As discussed in proposition three, a portion of Roberts' testimony was admissible and the remainder, though error, was harmless beyond a reasonable doubt. Although defense counsel did not cross-examine Roberts about why she had not mentioned Cooper's telephone call to her about the cableman during the initial investigation, defense counsel did ask questions to illustrate that Roberts did not know as much as she believed about Cooper. Asking questions to imply Roberts was making up her testimony about the telephone call could easily backfire and counsel was not ineffective for choosing to avoid that

pitfall. Further, counsel was not ineffective in failing to ask the trial judge to recuse. As discussed in propositions two and five, Appellant waived his right to have the trial judge disqualified and he was not prejudiced by the trial court's rulings during Detective Lucas' testimony. As such, he cannot show prejudice and these claims must fail.

¶ 55 Next, Appellant complains about counsel's failure to list adaptability to the structured environment of prison life as a mitigating circumstance in Instruction 13. Appellant contends the failure to specifically list this mitigating circumstance allowed the jury to disregard this mitigating evidence. With this contention, we cannot agree. The jury was instructed that "mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." Instruction 13, listing several specific mitigating circumstances, also provided that the jury could "decide that other mitigating circumstances exist, and if so, [could] consider those circumstances as well." While adaptability to prison life was not specifically listed, the jury was instructed it could consider the evidence presented and determine what evidence was mitigating. The majority of Appellant's second stage defense focused on his adaptability to a structured prison environment which defense counsel vigorously argued during closing argument to rebut the State's continuing threat contention. Given this record, we find the administered instructions adequately allowed the jury to consider the evidence of adaptability to prison life and Appellant was not prejudiced by counsel's failure to include it in Instruction 13. *See Cannon*, 1998 OK CR 28, at ¶ 62, 961 P.2d at 854.

¶ 56 Lastly, Appellant claims counsel failed to adequately advise him and provide him with sufficient information on which to base an intelligent decision on whether or not to testify. Alternatively, Appellant asserts a claim of state induced ineffective assistance of counsel by arguing counsel was forced to present Appellant's testimony after the State was allowed to introduce evidence of the Stevens homicide. As discussed in proposition one, evidence from the Stevens homicide was properly admitted to prove identity and absence of mistake or accident. As such Appellant's state induced ineffective assistance of counsel claim must fail. Furthermore, there is no evidence to support Appellant's claim that he was inadequately advised about the risks of testifying. Defense counsel noted on the record following the close of the State's evidence that he had spoken to his client and that Appellant wished to testify. Defense counsel did not mention calling Appellant as a witness during opening statement thereby leaving the option open so an intelligent decision could be made following the state's case-in-chief. Following the compelling evidence that demonstrated his guilt, Appellant elected to testify to tell his version of what happened. Counsel attempted to guide his client and bolster his credibility throughout the presentation of Appellant's testimony. Based on this record, we cannot find Appellant was inadequately advised or that counsel was ineffective. Accordingly, this claim must fail.

¶ 57 More troubling is the complaint raised in Appellant's application for an evidentiary hearing alleging counsel failed to investigate and use available mitigating evidence. Appellant argues counsel was deficient by failing to investigate and present the testimony of his family members to mitigate punishment especially in light of the victim impact evidence. Pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998), Appellant has filed an application for an evidentiary hearing and to supplement the record. Appellant includes, among other things, affidavits from family members who were willing to testify about their relationship with Appellant and request mercy, but who were not contacted by defense counsel. (Exhibits. B, C, and D) Defense counsel did speak with Appellant's sister briefly before trial began. Counsel initially asked her to testify, but advised her she would not be needed after she told him that Appellant had touched her inappropriately when they were

adolescents. (Exh. A) At first glance, counsel's failure to call Appellant's family members to testify seems attributable to sound strategy since the family knew of the inappropriate touching incident and one could see how counsel would not want this information before the jury. However, counsel elicited this information from his expert psychiatrist thereby eliminating that strategy argument.

¶ 58 It is all too tempting to second guess counsel and wonder why he did not use these family members given the compelling victim impact evidence and the resulting death sentence. However, that is precisely the pitfall we are to avoid. This Court will not second-guess trial strategy through the distorting effects of hindsight. *See Plantz v. State*, 1994 OK CR 33, ¶ 12, 876 P.2d 268, 274–75, *cert. denied*, 513 U.S. 1163, 115 S.Ct. 1130, 130 L.Ed.2d 1091 (1995). The record shows defense counsel did elicit much of the family members' proposed testimony concerning Appellant's background through Dr. Lindsey, the defense's psychiatric expert. It appears counsel chose not to call family members because he feared the jurors' reactions to the cross-examination of the family members about the improper touching incident. Instead, he chose to present a more clinical defense. The record further shows counsel mounted a well-reasoned defense to the aggravating factors and chose to focus on Appellant's adaptability to prison life with references to Appellant's mitigating background as a sub-theme. Because the evidence in aggravation was so strong and counsel's decision could be considered sound trial strategy, we find that an evidentiary hearing is not warranted because the application and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence in second stage.

¶ 59 In his final proposition of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of the errors in his case necessitates either reversal of his conviction or a modification of his sentence. We have thoroughly reviewed Appellant's claims and the record in this case which reveals no error which, singly or in combination, would justify either modification or reversal. Any irregularities or errors were harmless beyond a reasonable doubt. Because we find no error that warrants relief, this claim is denied. *See Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176, *cert. denied*, —— U.S. ——, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999).

## MANDATORY SENTENCE REVIEW

¶ 60 Pursuant to 21 O.S.1991, § 701.13(C), we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. A review of the record shows sufficient evidence was admitted to prove the two aggravating circumstances alleged by the State: (1) the murder was especially heinous, atrocious or cruel; and (2) Appellant constitutes a continuing threat to society. In mitigation Appellant presented evidence of his age at the time of the crime, his emotional and family history, evidence that he was under the influence of a mental/emotional disturbance at the time of the crime, evidence that the victim was a willing participant in the defendant's conduct and adaptability to prison life. After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate. We further find no error which warrants reversal or modification. Accordingly, the Judgment and Sentence of the trial court is **AFFIRMED.**

LUMPKIN, V.P.J., JOHNSON, J., CHAPEL, J., and LILE, J., concur.